# Exhibit 107 Part 2

# UK

What a dividend is

The meaning of 'dividend' for UK tax purposes has been debated for many years. It seems to have been a particularly hot topic since the introduction of the UK's dividend exemption in July 2009.

There is no generally applicable statutory definition of a dividend for UK tax purposes. Nor is there a universal common law meaning: 'applicable to various subjects, [the word "dividend"] is not intelligible without knowing the matter to which it is meant as referring'.[16] The word's ordinary meaning is 'a payment of part of the profits for a period in respect of a share in a company'.[17]

In contrast to the views of most UK tax advisers, HM Revenue and Customs (HMRC) argues that the term should be narrowly viewed as a payment out of the commercial profits of a company (and not any other profit or account that is distributable as a company law matter).

As a result there has been (and remains) some uncertainty as to the correct characterisation of certain payments, for example, payments on share redemptions or following a capital reduction, and payments by foreign companies out of share premium accounts.

The meaning of the term was considered in some detail in the recent case of *HMRC v First Nationwide*[18]. The case concerned the treatment of distributions made by a Cayman Islands company out of its share premium account and, in particular, whether those payments constituted dividends within the meaning of the applicable UK tax legislation.

The Upper Tribunal considered that the term 'dividend' should be construed by reference to the understanding of that term as a matter of legal machinery. It rejected HMRC's arguments that:

(a) a dividend must be a payment of profit. The Upper Tribunal considered the statements made in *Esso* and *Memec* to be appropriate in their context, but did not consider that they laid down a statutory test on the meaning of the term dividend. In any event, the Upper Tribunal considered that share premium *is* a type of profit for a Cayman Islands company; and

(b) the concept of a dividend did not cover payments from share premium (on the basis that it is not permissible under English company law for an English company to pay dividends from share premium account, and the business community would not understand the term dividend to cover payments out of share premium).

The Upper Tribunal disagreed. It held that in considering the meaning of the term dividend, the question is

---

16
Per Knight-Bruce LJ *Henry v Great Northern Railway* 27 LJ Ch1; see also *Re Chelsea Waterworks Co and Metropolitan Water Board* 73 LJKB 535 and *Re De Jong* [1946] Ch. 211.

17
Per Peter Gibson LJ in *Memec plc v CIR* 71 TC 77 at 117 (referring to a similar formulation in *Esso Petroleum Ltd v MOD* [1990] Ch 163 Harman J at 165).

18
[2011] UKUT 174 (TCC), [2011] STC 1540.

---

CONFIDENTIAL                                                                WH_MDL_00463490

what the relevant company can do under its governing law, not what it could do if it were English.

Restrictions under English company law on what constitutes a dividend should not be considered to be determinative of the overseas distribution's classification for UK tax purposes.

A Cayman Islands company could pay out share premium by way of dividend. The Upper Tribunal noted that there was no evidence to suggest that the business community would think that the payment, properly made pursuant to the legal machinery governing payments of dividends, was anything other than a dividend.

HMRC's appeal was dismissed by the Court of Appeal on 13 March 2012 ([2012] EWCA Civ 278).

The classification of a payment as a dividend or otherwise is not necessarily relevant to its UK tax treatment. However, there are cases where the classification of an item as a 'dividend' or 'other distribution', and as 'income' or 'capital' will be important.

For example, the taxation of individual recipients of overseas dividends differs according to whether the receipt is of an income or capital nature. And the manufactured payments rules (on which, see further below), apply only to manufactured payments that are representative of dividend amounts. So in this context the correct classification of the underlying dividend, of which the manufactured payment is representative, is critical.

## Other distributions

In addition to dividends, the UK brings into charge to tax certain other distributions. These include (subject to certain exceptions):

(a) a distribution by a company out of its assets (whether in cash or otherwise) in respect of its shares (but not if such distribution represents a repayment of capital on the share; nor if, and to the extent that, new consideration is received by the company for the distribution)[19];

(b) bonus issues of certain redeemable shares or securities;

(c) a transfer of assets or liabilities from a company to its members where the market value of the benefit obtained by a member is more than the market value of the new consideration. (This is subject to special rules that apply to transfers by subsidiary companies to parents, or between truly independent companies);

(d) payments in respect of certain 'equity notes' (being, broadly, certain types of perpetual debt instruments); and

(e) certain 'repayments of capital', including (a) distributions in respect of share capital that was issued or paid up otherwise than for new consideration, where that issue was not treated

---

[19] It is understood that HMRC's view (in contrast to the view of most tax advisers and the Tribunal in *First Nationwide*), is that distributions made out of a reserve arising from a reduction of share capital fall within this category, rather than constituting a 'dividend'. To ensure that this type of distribution does not fall outside the distributions regime, HMRC has introduced legislation providing that such distributions shall not represent a repayment of capital on the shares for these purposes. This provision applies only for corporation tax purposes, resulting in potentially different treatment applying to individual and corporate recipients of such distributions.

CONFIDENTIAL    WH_MDL_00463491

as a qualifying distribution at that time; and (b) bonus issues following a repayment of share capital.

Certain interest payments (including, for example, results-dependent interest) can also (in certain circumstances) be treated as a 'distribution', although these payments will not benefit from the distribution exemption (described below).

## Interaction with double tax treaties

Most UK double tax treaties contain their own definitions of the term dividend. These are typically based on the Organisation for Economic Co-operation and Development (OECD) Model Treaty.

The differences between the domestic law meaning and the treaty definition have had some significance in the past.

In *Memec*, the Court of Appeal was required to interpret the term dividend in particular articles in the UK–Germany double tax treaty. Notwithstanding the wide meaning afforded to the term in the context of the dividend article, the Court of Appeal considered that the same wide meaning was not to be afforded to that term in the context of the article that applied, so as to give credit for underlying tax. In the absence of anything indicating that the wide definition of dividend in the dividend article was to be taken as a general definition in the convention, the term was to be construed in accordance with UK domestic law. The Court of Appeal held that the payments in question – being distributions under a silent partnership agreement – were inconsistent with the ordinary meaning

of dividend under UK domestic law, being a payment of part of the profits for a period 'in respect of a *share* in a *company*'.

## Beneficial ownership

Dividend income is normally taxed in the hands of the beneficial owner. There is no statutory definition of beneficial ownership in UK law, but it is probably fair to say that it has a technical, narrow and fairly well-understood meaning.

Some principles that have emerged from case law are as follows. Beneficial ownership is ownership for one's own benefit, as opposed to ownership as trustee for another. A 'mere legal shell' of ownership, is not sufficient to give a person beneficial ownership of an asset. Instead the question is whether the owner has the right to sell or dispose of or enjoy the fruits of the asset in question. In addition, where there is an unconditional obligation to sell an asset, of which specific performance would be granted, beneficial ownership may be lost. Accordingly, a nominee or agent acting on behalf of an investor will not be regarded as beneficial owner of shares, despite having legal title to the shares. And, depending on the particular circumstances, where the legal owner has entered into an unconditional contract to sell the shares he may be deprived of beneficial ownership from the time of entering into the contract.

A note on stock loans and repos. Under a stock loan of shares, the stock borrower becomes the beneficial owner of the shares and accordingly the dividends paid on the shares

CONFIDENTIAL                                                                                    WH_MDL_00463492

Dividends received by the stock borrower are generally taxable (for a trader) or exempt (for an investment company) in the normal way (see further below). The manufactured payment is treated in the hands of the lender (at least so far as the application of the dividend exemption is concerned) as if it were a dividend on the underlying shares.

Under a repo, the repo lender (/repo buyer) will become the beneficial owner of the shares, and the dividends paid on the shares. However, the repo legislation requires this to be ignored for UK corporation tax purposes. Accordingly, the repo lender is treated for corporation tax purposes as if it does not hold the shares that it has bought, and does not make manufactured payments in respect of those securities. Similarly, the repo borrower (/repo seller) is treated for tax purposes as if it does hold the shares that it has sold, and does not receive manufactured payments in respect of those securities.

In both cases this is subject to an 'accounting override', which disapplies these general rules if (broadly) this is not consistent with the accounting treatment (so, for example, in the case of a repo lender if it recognises dividend income on the shares in its accounts).

It is worth briefly mentioning the scenario in which a sale of shares takes place cum dividend, which is settled with ex dividend stock. We understand that this is not an uncommon situation, particularly in certain European jurisdictions. Where the seller makes a payment to the buyer to compensate the buyer for receiving the stock ex dividend, there is a difficult question as to whether that compensation payment is just an accounting for the real dividend that is treated as belonging to the buyer, or whether the payment is a manufactured dividend, or whether it should be viewed for UK tax purposes as simply an adjustment to the contracted sale price.

The answer to this will depend among other things on whether beneficial ownership of the shares (and therefore the right to receive the dividend) passed to the buyer at the time of the contract.

If as a result of the sale contract, the seller has a mere legal shell of ownership, or if the contract is unconditional and would be enforced in equity by way of specific performance, then beneficial ownership may well have passed.

There is a question as to whether the term 'beneficial owner' as used in the context of a double tax treaty should carry a wider international meaning. Two legal developments are important in this regard:

(a) In *Indofood International Finance Ltd v JPMorgan Chase Bank* [2006] EWCA Civ 158, the Court of Appeal held that the term beneficial owner should be given an international fiscal meaning not derived from the law of contracting states.

It went on, broadly, to define beneficial ownership as meaning 'the full privilege to benefit directly from the [relevant] income'. *Indofood* was not a tax case, but a contractual dispute that turned on the interpretation of a non-UK double tax treaty.

Freshfields Bruckhaus Deringer LLP                    *Dividend taxation for cross-border transactions*

CONFIDENTIAL                                                                    WH_MDL_00463493

HMRC (in contrast to most taxpayers) is, however, of the view that the principles in the case can be applied in the case of treaties involving the UK, although HMRC has stated in guidance that (broadly speaking) it will only apply this international fiscal meaning in cases involving abuse; and

(b) the publication by the OECD on 29 April 2011 of a discussion draft on the clarification of the meaning of beneficial owner in the OECD Model Tax Convention, including proposed changes to the Commentary on Articles 10, 11 and 12 of the OECD Model Tax Convention.

This discussion draft has been prompted by uncertainty as to the meaning, and inconsistent application (by revenue authorities, courts and taxpayers alike), of the term beneficial owner as used in many double tax treaties.

There has been uncertainty as to whether domestic law interpretations of the term should be applied (the approach taken by the Tax Court of Canada in *Prévost Car, Inc v The Queen* (2008) TCC 231) or whether an international fiscal meaning should be followed (per the Court of Appeal in *Indofood*).

Additionally, particular difficulties have arisen where the term has been used in double tax treaties involving civil law jurisdictions, where it does not necessarily carry the same technical meaning as it does in many common law jurisdictions.

The draft commentary seeks to clarify the position by stating that the term should not be interpreted using a narrow technical meaning provided by domestic law, but that it should be interpreted in light of the object and purposes of the treaty (broadly, the avoidance of double taxation and the prevention of fiscal evasion and avoidance).

As such, the OECD suggests that beneficial ownership should be established where a person has full right to use and enjoy the payment unconstrained by a contractual or legal obligation to pass the payment received to another person.

Commentators have, on the whole, welcomed the OECD's aim to give more certainty to the meaning of the term beneficial ownership, and accordingly more consistent application. But most agree that the proposals in the discussion draft only increase this uncertainty.

The discussion draft seems to go much further than even the decision of the Court of Appeal in *Indofood* (as interpreted by HMRC) might suggest, and potentially casts doubt over the treatment of genuine commercial structures, including securitisations and financing transactions.

Given the reaction of most commentators, it is hard to see that the proposals will survive in their current form. But it seems likely that there will be a move towards a more international interpretation of the term beneficial owner. Also, from a UK perspective, HMRC is likely to be bolstered in its view that *Indofood* is applicable to the interpretation of the term in UK treaties.

CONFIDENTIAL                                                                    WH_MDL_00463494

## Taxation of UK recipients of dividends

### Corporations

Share dealers and banks are subject to tax on dividends received as part of their trading profits.

The corporation tax treatment of the receipt of company distributions for companies holding their shares on capital account was completely revised with effect from 1 July 2009.

With effect from that date, the UK now operates an exemption, rather than a credit, system for corporation taxpayers in receipt of all company distributions. The distinction between UK and overseas source dividends that had previously been a feature of the UK corporation tax rules in this area has been abolished, with a single charging regime, with exemptions therefrom, now applying to both.

The rules apply to dividends, as well as to other non-dividend distributions as described above. In addition, the rules apply to all distributions regardless of whether the distribution would be capital or revenue on general principles. This is a change to the pre-2009 position for dividends/distributions with a non-UK source. It is also distinct from the tax treatment of dividends/distributions received by individual shareholders (in each case, where the capital/revenue distinction was/is relevant – see further below).

Broadly, the starting point now is that corporation tax is chargeable on all UK and non-UK dividends and other distributions, unless those dividends are exempt.

The intention is for most dividends to satisfy the conditions for exemption.

Exemption is available if certain threshold conditions are met; ie, that the distribution falls within one or more of the five exempt classes, is not taken out of the exempt classes by the relatively extensive anti-avoidance rules and the distribution is not tax deductible in a foreign jurisdiction. (Note that the distribution exemption will also not apply to certain interest payments, which are treated as distributions, as mentioned above.)

The first three exempt classes are broadly designed to exempt dividends and other distributions made from a subsidiary to its parent, or made in respect of non-redeemable ordinary shares or in respect of portfolio shareholdings (less than 10 per cent).

A further 'catch-all' exemption applies to dividends derived from transactions not designed to reduce UK tax and the final exemption deals with certain shares accounted for as liabilities.

These exempt classes should exempt most dividends and other distributions, subject to the application of the anti-avoidance rules.

A distribution is taken outside an exempt class if it falls foul of the anti-avoidance provisions. These include certain targeted anti-avoidance provisions, which are intended to limit the availability of an exempt class in certain circumstances, and general anti-avoidance provisions, which potentially apply to dividends/distributions falling within any of the exempt classes.

CONFIDENTIAL

WH_MDL_00463495

Non-exempt dividends are subject to corporation tax at the prevailing rates. So far as non-exempt foreign source dividends are concerned, credit is given for any overseas tax withheld at source, and where dividends are paid to a company with a 10 per cent or more interest in the paying company, credit will also be given for tax paid on the profits out of which the dividend was paid.

### Individuals

The tax treatment of dividends in the hands of individual shareholders differs according to whether the dividends are received from a UK-resident or a non-UK-resident company.

Dividends received from a UK company are subject to income tax, regardless of whether the dividend is income or capital in nature. Dividends carry a tax credit equal to one-ninth of the dividend. The rate of tax on the gross dividend (ie, the dividend plus the tax credit) varies according to whether the individual is a basic rate, higher rate or additional rate taxpayer.

For individuals who are in receipt of dividends from an overseas company, the distinction between dividends of an income nature, and dividends of a capital nature, remains relevant.

Dividends received from an overseas company, and that are of an income nature, are subject to income tax, generally in the same way as dividends received from a UK company. In particular, the dividends typically carry a tax credit equal to one-ninth of the dividend, subject to certain conditions. The rate of tax on the gross dividend (ie, the dividend plus the tax credit) varies according to

whether the individual is a basic rate, higher rate or additional rate taxpayer.

### Taxation of foreign recipients of dividends

There is no withholding tax on payments of dividends by a UK company. However, the UK may charge UK income tax on UK dividends received by certain non-UK residents.

In particular, if a relevant double tax treaty includes a provision that entitles the non-UK resident to a tax credit (for portfolio shareholdings, the entitlement is normally to the same one-ninth tax credit that a UK individual is entitled to), then the UK is typically authorised to charge tax on the gross amount of the dividend and the tax credit.

The rate at which tax is charged by the UK in these circumstances (currently 10 per cent) is by design equal to the amount of the tax credit. So the credit will exactly offset the tax charge and the non-resident will not need to pay any UK tax to HMRC (and nor will they be entitled to any payment from HMRC in respect of the tax credit).

### Taxation of manufactured dividends

The general principle underlying the UK's provisions dealing with taxation of manufactured dividends is, so far as possible, to treat the manufactured payment in the hands of the recipient in the same way as if it was a 'real' dividend.

CONFIDENTIAL

WH_MDL_00463496

The tax treatment of manufactured dividend payments in respect of UK shares (MD) is reasonably straightforward. There is no withholding tax charge on payment of the MD, nor any 'reverse charge' (see further below) on the receipt of the MD.

If the dividend of which the MD is representative is taxable (ie, not exempt), then the payer of the MD may be entitled to a deduction as a trading expense or an expense of management (subject to the application of anti-avoidance rules). The recipient of the MD is treated as if the MD was a dividend on the shares, and so taxed in the normal way (see above).

The tax treatment of manufactured dividend payments in respect of non-UK shares (ie, manufactured overseas dividends or MODs) is more complex.

Similar rules apply in relation to the deductibility of MODs for the payer, as described above; ie, if the dividend of which the MOD is representative is taxable (ie, not exempt), then the payer of the MOD may be entitled to a deduction as a trading expense or an expense of management (subject to the application of anti-avoidance rules).

Similarly, the recipient of the MOD is treated as if the MOD was an overseas dividend and so taxed in the normal way (see above).

However, a UK payer of a MOD is required to withhold, and account to HMRC for, an amount of income tax on the MOD, equal (broadly) to the maximum amount of tax that would have been payable to the overseas tax authority on payment of a real dividend to a UK recipient.

There are numerous exceptions to this rule, including for payments made to non-UK recipients, and for payments made to certain approved UK intermediaries.

If the payer of the MOD is a non-UK payer, but the MOD is received by a UK recipient, then the UK recipient is liable to account for the tax for which the payer would have been liable to account had it been resident in the UK (the so-called reverse charge).

Regulations apply so as to reduce (or to eliminate entirely) the amount of the reverse charge, with the intention that the UK recipient should be left in the same net cash position on receipt of the MOD, that he would have been in had he received the overseas dividend of which the MOD is representative. Exceptions to the reverse charge also apply.

It is worth briefly mentioning the operation of these rules where foreign branches are involved. This is a tricky area.

Take, for example, a US branch of a UK company, which is in receipt of manufactured dividends in respect of US shares. The UK reverse charge rules apply equally to manufactured payments made to the US branch as to manufactured payments made to the UK head office (unless an election has been made under the foreign branch exemption).

Accordingly, the reverse charge rules will apply on receipt by the US branch of the manufactured overseas dividend. This treatment applies notwithstanding the fact that no withholding would have been suffered had the US branch received the actual US dividend.

CONFIDENTIAL    WH_MDL_00463497

This seems to conflict with the general principle underlying the manufacture payments rules (as described above) which is, so far as possible, to treat the manufactured payment in the hands of both the recipient and the payer in the same way as if it was a real dividend on the underlying shares.

As discussed in more detail in the section addressing US taxation of dividends and manufactured payments, legislation has recently been introduced in the US concerning payments of substitute dividends under stock loans or repos and dividend equivalent amounts payable under certain derivative contracts.

Under the terms of this recently enacted legislation, substitute dividends made pursuant to a securities lending or a repo transaction and payments made pursuant to certain notional principal contracts – in each case that are contingent upon, or determined by reference to, the payment of a dividend from sources within the US, and that are received by a foreign person – will be treated as if they were dividends from sources within the US.

On that basis, such payments (even where made between non-US residents) would prima facie be subject to US withholding tax at a rate of 30 per cent.

The introduction of this legislation raises a number of questions, including whether treaty relief would be available to treaty-protected recipients of such payments under the 'business profits' and 'other income' articles of any applicable double tax treaties and issues of enforceability.

As to the availability of treaty relief in respect of US withholding on payments of substitute dividends and dividend equivalent payments made to treaty-entitled entities, the correct characterisation of these payments for double tax treaty purposes is not straightforward (at least from a UK perspective).[20]

The definition of dividend in Article 10(3) of the OECD Model Treaty requires (among other things) that the income constitutes (i) income from shares; (ii) income from rights participating in profits; or (iii) income from 'other corporate rights' that is subjected to the same taxation treatment as income from shares by the laws of the state of which the company making the distribution is a resident.

Dividend-equivalent payments arise from a contractual relationship between two parties, rather than being income paid because of an equity investment in the company. As such it is not immediately clear that dividend-equivalent payments would satisfy these criteria, as a strict technical matter. The definition of a dividend in the US–UK double tax treaty is broader than the OECD Model Treaty. In the US–UK treaty, dividend includes 'any other item which, under the law of the Contracting State of which the company paying the dividend is a resident, is treated as a dividend or other distribution of the Company'.

---

20
The correct characterisation of these payments for treaty purposes has not been specifically addressed by the US government. It seems highly likely that the US government would regard them as falling within the terms of the dividend article of any applicable double tax treaty. An approach is that the US will view the recipient of the substitute dividend or the dividend equivalent amount as the beneficial owner of the actual US dividend for treaty purposes, and subject to US withholding tax on that basis.

CONFIDENTIAL                                                                    WH_MDL_00463498

There are difficult questions as to whether even this definition is broad enough to capture dividend-equivalent payments.

- Is it the case that dividend-equivalent payments should be considered to be treated as a dividend in the US, noting that for domestic US tax purposes they are not?

- Is it even right to look to the law of the US, noting that the relevant law is that of the jurisdiction of the company that is paying the dividend; ie, arguably the law of the jurisdiction of the company making the manufactured payment?

- Is it right that the dividend-equivalent payment should be regarded as a dividend for double tax treaty purposes in the hands of the non-US recipient of the payment, when it is not regarded as a dividend in the hands of the payer?

In addition to these technical questions, it is worth remembering that double tax treaties are contractual agreements between the contracting states and, as such, must be interpreted in line with normal principles of contractual interpretation. Accordingly, regard must also be had to any exchanges of notes between the contracting states, technical explanations to the treaty in question, or any subsequent protocols, in establishing the intentions of the contracting states.

Currently there do not appear to be any such exchanges or agreements between the US and the UK as to the application of the 'dividends' article to US dividend-equivalent payments.

Ultimately, in addition to this, it is quite possible that the tax authorities of other jurisdictions (including the UK) would not dispute the position taken by the US as a matter of practice[21]. This has not, however, so far been tested.

Even if clarity is reached on these issues, there are questions over the ability of the US to enforce any US withholding tax that it does consider to be due on payments between two non-US entities, as a matter of practice.

There are likely to be some opportunities for the US to enforce the tax domestically, and it is possible that the Internal Revenue Service could look to seize assets from accounts held in the US in the name of the withholding agent, and there might also be some opportunities for extra-territorial enforcement. But it is unclear how this is likely to operate in practice.

---

21
It is noted, however, that HMRC has in the past taken the view that manufactured dividends should fall within the scope of the 'other income' clauses of the UK's treaties.

CONFIDENTIAL    WH_MDL_00463499

# US

## What a dividend is

A 'dividend' is defined as a distribution by a corporation to its shareholders from current or accumulated earnings and profits. If a corporation has earnings for the year in which the distribution is made, the distribution will be a dividend to the extent of those current earnings, even if the corporation has an accumulated deficit. If the corporation has no current earnings, the distribution will be a dividend to the extent of accumulated earnings.

A dividend can be in cash or in property, which may include shares or securities of the distributing company. Distributions of shares generally are not taxable unless the shareholders can elect to receive cash instead or the distribution changes the shareholders' relative interests in the corporation. A distribution changes the shareholders' relative interests if, for example, some receive shares while others receive cash or some receive ordinary shares while others receive preference shares. Rights offerings, distributions of convertible securities and changes in conversion ratios can result in constructive dividends to shareholders receiving those equity rights if other shareholders receive cash during the same period.

A distribution in redemption of shares can be treated as a dividend if it has the same economic consequences as a dividend. A redemption distribution generally has the same economic effect as a dividend if it does not meaningfully reduce the redeemed shareholder's proportionate interest in the corporation. Redemptions that are proportionate or regularly recurring are likely to be dividends. Redemptions that are substantially disproportionate or end the shareholder's interest in the corporation are not dividends. A small reduction in a public shareholder's interest in a listed company generally suffices.

Purchases of the shares of an affiliated corporation can be treated as dividends. When one corporation buys shares of a commonly controlled corporation from the person in control, the purchase price typically is treated as a distribution by the buyer in redemption of shares that it constructively issued to the seller and then, if the amount exceeds the buyer's earnings, a distribution by the commonly controlled corporation to the extent of its earnings. The same treatment applies when a subsidiary buys shares of a commonly controlled corporation from an affiliate. Constructive dividends of this type can shift earnings between corporations or repatriate indirect foreign tax credits without triggering foreign withholding tax.

Distributions of shares and securities as part of a tax-free merger, acquisition, re-organisation or demerger generally are not treated as dividends.

Most US income tax treaties contain their own definitions of the term dividend, but any differences between the treaty definition and the domestic law definition have not been meaningful in practice. The treaty definitions generally are based on the definition in the Organisation for Economic Co-operation and Development (OECD) Model Treaty. In essence, they treat distributions as dividends if the distributions would be assimilated to

CONFIDENTIAL

WH_MDL_00463500

dividends under the law of the source country. Some treaties express that notion by referring to the law of the distributing corporation's residence country. Others refer to the law of the payer's residence. Others contain quirks responsive to concerns of their time. Domestic regulations and enforcement practices have not drawn distinctions between them in practice despite differences in wording that might support such distinctions.

### How dividend income is attributed

A dividend typically is taxed to the beneficial owner of the shares on the record date when the distributing corporation determines who is entitled to the payment.[22] Dividends on shares sold between the dividend declaration and the record date therefore are the income of the buyer or subsequent holder on the record date. Shares sold after the record date can be sold cum dividend,[23] but the dividend remains the income of the seller. The dividend amount paid to the buyer is treated as a reduction in the purchase price for the shares.

Straightforward sales of future dividends are uncommon, but in principle, sales made before a dividend has been declared can shift the dividend income to the buyer in some circumstances. The question in each case is whether the shareholder has

sold the dividend or merely assigned the dividend income. The answer turns on whether the buyer has rights against the corporation or only against the seller and whether the buyer truly takes a risk that no dividend will be declared and paid.

Case law provides the only guidance. It indicates that purported sales of amounts substantially certain to be received will be treated as assignments of income rather than true sales. If the sale is an assignment of income, the seller must take the dividend income into account and the transaction is likely to be treated as a loan from the buyer to the seller secured by the dividend right.

Dividends more commonly are transferred as the result of stock loans, sale and repurchase agreements or (in substance if not in fact) derivative transactions. Stock loans are the simplest case. A stock lender is not the beneficial owner of dividends paid on shares lent before the record date. The dividends belong to the owner of the share on the record date. The manufactured or substitute dividend paid to the lender is not a dividend, although (as explained below) it will be treated like a dividend for withholding tax purposes.

Even some stock loan transactions, however, can be treated differently. When the lender simultaneously enters into a long derivative with the borrower (or an affiliate) on the same shares, the lender might remain the beneficial owner of the shares if they are pledged to secure performance of the derivative or other circumstances indicate that the borrower is holding them for the lender's account. In that case, dividends on the shares would remain the lender's income.

---

22
The beneficial owner of portfolio shares typically is not the record owner because shares commonly are held by nominees for the financial institutions with which investors hold accounts.

23
Shares trade cum dividend on stock exchanges until the last day on which trades settled in the regular way will settle on or before the record date.

CONFIDENTIAL    WH_MDL_00463501

Repurchase agreements are more complicated because they can be treated as true sales of the shares or as loans secured by the shares. Whether the seller or the buyer is the beneficial owner of dividends paid on shares sold before the record date depends on the circumstances. When the buyer can sell or rehypothecate the shares (as most market standard agreements permit), the agreement typically is a true sale of the shares and the dividend belongs to the buyer.

But surrounding circumstances or arrangements, especially in structured transactions, effectively may prevent the buyer from retransferring the shares. Equivalent shares, for example, might not be readily available, or the shares initially transferred might be pledged to secure the buyer's obligation to redeliver equivalent shares. In those cases, the repurchase agreement is likely to be treated as a loan from the buyer to the seller, secured by the shares. The seller therefore would remain the beneficial owner of the shares and the dividends notwithstanding the form of the transaction.

The result in an equity derivative transaction depends on its terms and the surrounding circumstances, but the long party to a market standard equity derivative typically will not be the beneficial owner of the underlying shares or the dividends paid on them. The basic factors that determine ownership of the underlying shares are those already described.

The relevant considerations, however, are more numerous because circumstances can vary greatly. A shareholder that enters into a short derivative generally should remain the beneficial owner of the shares and the dividends on them (although the transaction may be treated as a constructive sale of the shares solely for the purpose of accelerating gain recognition). The result can be different, however, if the shareholder lends the shares to the short party or obligates itself (legally or economically) to deliver particular shares to the short party.

Pledging the shares to be delivered to a forward buyer without retaining the right to substitute other collateral, for example, might show that the transaction was an upfront sale. Similarly, a party taking a naked long derivative position typically should not become the beneficial owner of the underlying shares (although the transaction may be treated as a constructive purchase of the shares solely for preventing the long party from treating amounts equivalent to underlying dividends as capital gains).

As long as the short party is not obliged (either legally or economically) to hold the shares or to deliver particular shares, the long party generally should not be treated as the beneficial owner of the shares or the dividends. Naked long/short derivative combinations should be treated no differently unless they can be settled physically and the circumstances indicate that one party is substantially certain to acquire particular shares from the other. In all those transactions, the short party generally should not be treated as economically compelled to hold the underlying shares if they are readily traded.

CONFIDENTIAL                                                  WH_MDL_00463502

## Domestic recipients of dividends

Dividends US taxpayers receive are ordinary income subject to tax at the generally applicable progressive rates. Little dividend income bears tax at those rates, however, because dividend income enjoys important concessions. There is no withholding tax on dividends paid to domestic recipients, except a generally applicable backup withholding tax on payments to non-corporate persons who have not properly identified themselves as responsible taxpayers.

### Corporate shareholders

Corporate shareholders enjoy a dividends-received deduction that reduces the effective tax rate on dividends. The dividends-received deduction for portfolio dividends (dividends from corporations in which the shareholder owns less than 20 per cent of the shares by vote and value) is 70 per cent, producing an effective rate no higher than 10.5 per cent at the top marginal rate of 35 per cent.

The deduction generally does not apply to dividends from foreign corporations (except for dividends from 10 per cent-owned foreign corporations out of their earnings from direct US businesses or 80 per cent-controlled US subsidiaries). There are important limitations on the dividends-received deduction. It generally is not available to the extent the dividend-paying shares are debt-financed. It also is not available if the shareholder has insufficient economic exposure to the shares.

To have sufficient exposure, the shareholder must hold the shares for more than 45 days during a 91-day period surrounding the ex dividend date and make no related payments on positions in substantially similar or related property. The shareholder also may not hedge its long position in the shares by selling forward, buying or writing options or entering into certain other transactions in substantially identical shares or securities.

### Non-corporate shareholders

At least through the end of 2012, qualified dividend income of most non-corporate shareholders is taxed at the reduced rate applicable to capital gains (that top marginal rate is 15 per cent) if the shareholder satisfies economic exposure requirements similar to those corporate shareholders must satisfy to claim the dividends-received deduction. Dividends from US corporations generally qualify, and dividends from foreign corporations entitled to US tax treaty benefits or on foreign shares traded on US stock exchanges generally qualify.

Dividends paid to tax-exempt investors such as pension funds and charitable institutions are not subject to tax as long as the shares are not debt-financed. Dividends paid to regulated investment companies and partnerships effectively are taxed to their shareholders or partners rather than to the entities themselves.

## Foreign recipients of dividends

Dividends US corporations pay to non-US persons are subject to a 30 per cent US withholding tax. Most US tax treaties reduce the rate to 15 per cent for dividends from portfolio investment and 5 per cent for dividends from direct investment (typically defined as owning at least 10 per cent of the company's voting shares). A few treaties,

CONFIDENTIAL    WH_MDL_00463503

including the treaties with France, Germany, the Netherlands and the UK, exempt dividends from qualified direct investment (defined as owning at least 80 per cent of the voting shares for at least one year).[24]

Non-US shareholders can claim reduced withholding by certifying their entitlement to the withholding agent. A shareholder must certify (on IRS Form W-8BEN) that it is the beneficial owner of the dividend and that it satisfies the conditions for claiming the treaty benefit. Virtually all US treaties now contain limitation on benefits articles. The limitation on benefits article usually prevents special purpose and structured finance entities from claiming treaty benefits even if they are resident in the treaty country. Nominees, intermediaries and partnerships cannot claim benefits, but they can transmit (with IRS Form W-8IMY) certifications provided by their principals or partners. All certifications are made under penalties of perjury.

The so-called FATCA rules enacted in March 2010 will impose a 30 per cent withholding tax on US source payments to foreign entities unless the recipient has agreed to provide, in the case of a financial institution, information about US accounts and, in all other cases, information about its US beneficial owners. The rules will apply to US corporate distributions whether treated as dividends or redemption gains. Withholding will apply to payments made after 2013. A grandfathering rule for outstanding obligations does not apply to shares.

## Manufactured dividends

A statute effective from September 2010 aims to prevent the use of stock loans, repurchase agreements and equity derivatives to avoid US dividend withholding tax. The statute imposes the dividend withholding tax on all dividend equivalents. It repeals the so-called same-country exception that allowed substitute payments between persons subject to the same rate of US withholding tax to be paid free of withholding. The statutory definition of dividend equivalents specifies typical equity swap transactions and gives the US Treasury unlimited authority to bring other equity derivatives within its scope. The Treasury issued temporary and proposed regulations exercising that authority.

### Withholding on dividend equivalents

The statute takes an aggressive approach. Withholding applies to gross dividend equivalent amounts used to compute net payments, so tax must be paid even if no payments are made under the contract. Each party to a contract or transaction is liable for the tax. The Treasury can issue regulations to prevent successive withholding in a chain of dividends and dividend equivalents, but only to the extent the taxpayer can show withholding tax is not due or already has been paid on a dividend or dividend equivalent in the chain or to address the role of financial intermediaries in the chain.

---

24
Dividends effectively connected with (or in the case of a treaty-entitled recipient, attributable to) a US branch operation are subject to US net income taxation rather than US withholding tax. Dividend income rarely is effectively connected with branch operations because the US has only a limited force of attraction rule and tax regulations effectively presume that dividends are not connected with branch operations.

---

CONFIDENTIAL                                                        WH_MDL_00463504

Dividend equivalents are substitute dividends paid in securities lending and repurchase transactions that directly or indirectly are contingent on or determined by reference to the payment of a US source dividend, payments under a specified notional principal contract (SNPC) that involve the same contingency or reference and any other payment that the Treasury determines to be substantially similar to the other two types of payments. Notional principal contracts include swaps, caps, floors and some collars. The recently proposed Treasury regulations would expand the definition of dividend equivalents to cover payments under equity-linked instruments, including purchase price payments and purchase price adjustments, that are contingent on or determined by reference to a dividend. Equity-linked instruments would include futures, forwards, options and other contracts or combinations of contracts that reference underlying securities. The expanded definition would apply after 2012.

A notional principal contract is an SNPC under the statute if:

- a long party transfers the underlying security to a short party at commencement;

- a short party transfers the underlying security to a long party on termination;

- the underlying security is not readily tradable on established securities markets;

- a short party posts the underlying security as collateral with a long party; or

- the US Treasury identifies the contract as an SNPC.

Under the regulations proposed to apply after 2012, SNPCs would include any notional principal contracts and equity-linked instruments where:

- the long party sells the underlying security when the contract prices or buys the underlying security when the contract terminates[25];

- the underlying security is not regularly traded on a qualified exchange;

- an underlying security represents more than 10 per cent of the value of the collateral posted by the short party;

- the term of the contract is fewer than 90 days;

- the long party controls the short party's hedge (by right or in practice);

- the notional amount is more than 5 per cent of the total public float of the underlying security or 20 per cent of the 30-day average daily trading volume as of the inception of the contract[26]; or

- the contract is made after the announcement of a special (non-recurring) dividend.

**Preliminary guidance**

The temporary and proposed Treasury regulations have begun to answer

---

[25]
Under the proposed regulations, a person related to a contract party is considered a party to the contract. A hedge contract between related dealers is not an SNPC, however, if they entered into both the hedge and the hedged contract in the ordinary course of dealing.

[26]
The notional amount for this purpose is the aggregate notional amount of all notional principal contracts to which either contract party is a long party, so the parties would have to rely on representations from each other.

---

Freshfields Bruckhaus Deringer LLP    *Dividend taxation for cross-border transactions*

CONFIDENTIAL    WH_MDL_00463505

questions about the withholding tax on dividend equivalents.

First, the temporary regulations clarify when the tax must be withheld. The parties must withhold on gross dividend equivalents taken into account to determine a net amount transferred under the terms of the contract, even if the net payment is zero or the person subject to withholding is the party making the net payment. The withholding tax therefore applies on what would have been the payment date if the gross amount had not been reduced or eliminated by netting.

Second, the proposed regulations would expand the definition of SNPC to include most equity derivatives, as explained above. This was expected. By allowing a transition period, however, the proposed regulations seem to permit parties to avoid withholding on dividend equivalent payments made during 2012 under futures, forwards and options. Other recently proposed regulations that expand the background definition of a notional principal contract, however, might be taken to narrow the latitude apparently left open.[27]

Third, the proposed regulations contain bright-line rules for determining when market trades of the underlying securities will be treated as a transfer of the securities between contract parties. The regulations would impose withholding whenever the long party trades the underlying security at the start or end of the contract.

The proposal is not surprising. Both the legislative investigation that led to the statute and audit directives by the tax authorities reflect a belief that trades made on the market at a price matched to the pricing convention used in a contract effectively constitute transfers between the contract parties. The co-ordinated action and the absence of price risk seem to be the decisive factors. The bare statutory language that applies until the proposed bright-line rules become effective, however, is not clear on these points. Deferral of the bright-line rules suggests that the statute alone should not be understood to deem all trades on the market to be transfers between the parties that can make their contract an SNPC.

Fourth, the proposed regulations address contracts on equity indices. A contract that references a customised index or more than one underlying security would be treated as a contract on each component security. Any index would be a customised index unless contracts on the index trade on a qualified board or exchange. Even a traded index would be a customised index unless it has at least 10 component securities and no component or group of components is too heavily weighted.

Fifth, the proposed regulations would relax the statutory provision that treats a contract as an SNPC whenever the short party pledges the underlying securities. Under the statute, a routine whole portfolio pledge might trigger withholding in situations where withholding otherwise would not apply. The wary can avoid this trap by carving underlying securities out of the pledge. The proposed regulations would substitute a simple rule that ignores

---

27
See Prop. Treas. Reg. § 1.446-3(c) (proposing among other things that single payment contracts are notional principal contracts if the single payment includes an amount fixed in advance of payment).

CONFIDENTIAL    WH_MDL_00463506

pledges unless the underlying security represents more than 10 per cent of the collateral posted by the short party.

Sixth, the proposed regulations clarify that payments based on an estimate of expected dividends are not dividend equivalents. An amount is not considered an estimate after the company that will pay the dividend has announced it. An amount also is not an estimate if it is adjusted for the amount of an actual dividend. This rule reflects present law, which generally does not treat the buyer of a dividend as the owner of the dividend for tax purposes unless the purchase price is fixed and the buyer has no recourse against the seller if the dividend is not paid.

Finally, the proposed regulations would clarify that dividend equivalents are treated as dividends for US income tax treaty purposes. Some commentators have suggested that the statute could not apply to payments made to recipients entitled to the benefits of a treaty that defines 'dividends' to include only payments treated as dividends under US law.

Dividend equivalents are not treated as dividends when paid to US recipients, the argument goes, so they do not fall within that definition. The argument is coherent, but it was made and rejected almost 20 years ago when Treasury regulations treated manufactured dividends paid under stock loans, repurchase agreements or similar transactions as dividends for all treaty purposes. It was not conceivable that the Treasury would take a more permissive view when it implemented a statute that tightened dividend withholding. It also seems unlikely that the competent

authorities in most treaty jurisdictions could contest the US Treasury position.

**Successive withholding**

Although the same-country exception from withholding has been repealed, solutions for excessive withholding in some common situations have not yet appeared. A 2010 notice indicates that the Internal Revenue Service expects to develop a credit forward system that will allow a taxpayer to credit against its withholding tax obligation the tax it can show to have been collected from earlier dividend or dividend equivalent payments in a chain of payments. The notice also contemplates a regime under which financial institutions can become qualified securities lenders (by subjecting themselves to audits like those that now apply to qualified intermediaries) entitled to receive gross payments and self-assess the tax due on transactions they handle.

The recently issued temporary and proposed regulations provide no further guidance, and the tentative system described in the 2010 notice leaves parties to normal transactions exposed. A typical non-US short seller, for example, cannot demonstrate that tax was withheld on the underlying dividend because it does not know who holds the shares it sold. Even the qualified securities lender handling the transaction often would not know whether tax was withheld unless it happened to act for the short buyer and the buyer did not resell the shares before dividend date. Further guidance, presumably, will address typical situations, but it almost certainly will force stock loans into the hands of qualified securities lenders.

CONFIDENTIAL

WH_MDL_00463507

# Cross-border case studies

The following case studies assume the equity share would, in each case, be lower than 5 per cent.

### 1. Transfer of shares across the dividend record date

**Combination of long share position and forward sale**



A non-resident investor (Investor) holding (listed) shares (the Shares) in a tax resident issuer (Issuer) sells the Shares under a spot sale to a tax resident credit institution (Bank). Trade date and settlement date occur before Issuer's dividend record date.

Simultaneously, Bank enters into a cash-settled forward sale over an equal number of the purchased Shares with a tenor of at least 10 days; ie, the forward sale settles after dividend record date. The forward counter-party is Investor (a group company of Investor). The calculation of the cash settlement payment under the forward will take into account [X per cent] of the gross dividend (ie, as a cost to Bank).

**Austria**

Under Austrian tax law, the Austrian bank is considered the beneficial owner of the shares on the dividend record date despite the conclusion of the cash-settled forward. The Austrian bank (or another corporate investor) is exempt with the gross dividend from Austrian shares (or EU shares or share in corporations resident in a third state with which Austria has agreed a comprehensive exchange of information clause). Correspondingly, the cash payment to the foreign investor on expiry of the cash-settled forward would not be deductible for corporate income tax under general rules if considered directly connected to the tax exempt dividend income.

Payments under a derivative could, in principle, be subject to Austrian withholding tax as of 1 April 2012 if paid by an Austrian depository. However, an exemption from Austrian withholding tax applies in case of payments to non-Austrian resident recipients. The Austrian bank should, therefore, not be obliged to levy Austrian withholding tax when settling the forward. In other words, the foreign investor should not be taxable in Austria with the income received under a derivative. By contrast, had the foreign investor received the dividend, a tax liability (in relation to most treaty countries) of at least 15 per cent would have arisen.

CONFIDENTIAL

WH_MDL_00463508

The transaction should not be re-qualified on the grounds of the domestic anti-abuse rule if bona-fide economic reasons prevail, for example, if entered into in the normal course of equity derivatives trading activities that may lead to pre-tax profits or if the Austrian bank has an actual risk position.

## Belgium

From a Belgian tax perspective, the transaction should be treated as follows:

- as legal owner of the shares on the dividend record date, the domestic bank would be considered the recipient of the dividend for Belgian tax purposes. Hence, the dividend payment received from the domestic issuer would be included in the domestic bank's taxable income for corporate income tax purposes;

- a withholding tax rate of 21 per cent should, in principle, apply to the dividend payment made by the domestic issuer to the domestic bank which is creditable fully imputed on the domestic bank's corporate income tax (any excess amount being reimbursed).

- correspondingly, the cash settlement payment made to/received from the foreign investor on expiry of the cash-settled forward should be deductible/ taxable at the level of the domestic bank.

## France

The transaction should be treated as follows from a French tax perspective:

- as legal owner of the shares on dividend record date, the French bank would be considered the recipient of the dividend for French tax purposes. Consequently,

the dividend payment received from the French issuer would be included in the French bank's taxable income for French corporate income tax purposes;

- since both the French issuer and the French bank are French tax residents, no withholding tax would be due on the dividend payment;

- the cash settlement payment to the foreign investor on expiry of the forward sale should be deductible from the French bank's taxable income for corporate income tax purposes; and

- to the extent that the cash settlement payment made to the foreign investor would not qualify as a dividend payment, no French dividend withholding tax would apply to such payment.

It cannot be excluded that the French tax authorities would consider that the sole purpose of the transaction is to avoid the dividend withholding tax that would have been payable had the dividend been paid directly to the foreign investor and, on the basis of the domestic anti-abuse rules, consider that the beneficial owner of the dividend payment is in fact the foreign issuer so that the dividend withholding tax is applicable. The fact that the forward sale would be cash settled and on arm's-length terms should provide some comfort as to the level of risk of such a challenge.

## Germany

Under German tax law, the domestic bank is considered as the beneficial owner of the shares on the dividend record date despite the conclusion of the cash-settled forward. Hence, the domestic bank is fully liable to

CONFIDENTIAL                                         WH_MDL_00463509

corporate tax and trade tax with the gross dividend (net dividend plus withholding tax credit/refund). Correspondingly, the cash settlement payment made to the foreign investor on expiry of the cash-settled forward is 100 per cent deductible for both corporate tax and trade tax purposes. In particular, no loss ring-fencing applies since the forward hedges a trading book position of the domestic bank.

The domestic bank is under no withholding tax obligation when settling the forward; ie, the foreign investor is not taxable in Germany with the received MOD. In contrast, had the foreign investor directly received the dividend, a definite tax liability of at least 15 per cent would have arisen.

The transaction cannot be requalified on the grounds of the domestic anti-abuse rule. The legislator introduced in the past special anti-abuse rules aimed at withholding tax arbitrage without expanding the scope of application of such rules to foreign counter-parties who are not entitled to a (full) refund of domestic withholding tax. Pertinent case law accepts such transactions if the German taxpayer is allowed to discharge a potential obligation to re-deliver the acquired shares with shares of the same kind rather than the identical shares and if the spot purchase and the forward sale are not documented under the same agreement.

## Italy

As a general principal, the domestic bank may be considered the legal owner of the shares received under the spot sale and, therefore, it would be entitled to the dividend paid by the domestic issuer. As a consequence, dividends collected by the domestic bank must be subject to taxation according to what discussed under 'Business partnerships and corporations', above.

MODs paid to the foreign investor under the forward sale would represent an Italian source capital gain for Italian tax purposes, as such not subject to dividend withholding tax as said under 'Treatment of manufactured overseas dividends under stock loans or derivatives', above, and exempted in Italy if the foreign investor is a white-list investor on the basis of a specific Italian exemption or may benefit from a double tax treaty protection.

That said, the Italian tax authorities could scrutinise the transaction to consider whether this qualifies as an abusive trade, to avoid Italian withholding or substitute taxes. In particular, if they were to find that the shares originate from one investor and have finally returned to the same investor on terms that the domestic bank was at no risks under the transaction (since it was in substance acting as if it was de facto a mere fiduciary/agent in the collection of the dividend), the authorities could argue that the foreign investor has executed a dividend washing trade over the shares.

The main risk concerns the possible application of the 20 per cent dividend withholding tax on the manufactured payments due under the derivative, together with tax sanctions ranging between 150 per cent and 250 per cent of the omitted withholding or substitute tax, and interest for late payment of taxes.

## Netherlands

First, it needs to be considered whether or not the domestic bank is considered the economic owner of the dividends for

CONFIDENTIAL                                                                      WH_MDL_00463510

Netherlands tax purposes (as mentioned above, there is a preliminary question of whether the economic/tax ownership doctrine can apply to (listed) shares). If under the cash-settled forward sale the price is set taking into account a fixed percentage of the *expected* amount of the gross dividend, the domestic bank should have economic risk with respect to, and is thus likely to be considered the economic owner for Netherlands tax purposes of, the dividends.

The next question is whether the domestic bank is considered the beneficial owner under the anti-dividend-stripping rules.

Whereas the shares are acquired by the domestic bank shortly before the dividend record date, the domestic bank may be considered to have made a payment on the dividends as part of the purchase price for the shares. As such, there is a small risk that the domestic bank might fail to become beneficial owner of the dividends under the anti-dividend-stripping rules on the basis of the mere acquisition; ie, even before the cash-settled forward sale is considered, in case the foreign investor is not entitled to 100 per cent of the dividends.

Under the cash-settled forward, the domestic bank clearly pays a consideration on the dividends (ie, a fixed percentage of the expected dividends as MOD). Furthermore, through the cash-settled forward the foreign investor – if the same entity – retains a position in the shares similar to the position it had before the cash-settled forward sale was entered into. Consequently, the domestic bank should not be considered the owner of dividends under the anti-dividend-stripping rules and thus not be entitled to a credit for DWT. This would

only be different if the foreign investor is entitled to 100 per cent of the dividend as well (and/or in case a treaty overrides the Netherlands domestic anti-abuse rules).

The dividends and the MOD are taken into account in determining the domestic bank's taxable income for corporate income tax purposes.

The MOD effectively paid by the domestic bank under the cash-settled forward is not subject to DWT.

### Spain

The domestic bank should be deemed the legal owner of the shares after execution of the spot sale and, as general rule, should be fully liable for corporate income tax with respect to the gross dividend. The cash settlement made to the foreign investor should be fully deductible for tax purposes.

The foreign investor should not be subject to withholding tax in Spain on payment of the MOD.

Although the domestic bank should be entitled to a withholding tax credit on the gross dividend received, the transaction could be re-characterised by the Spanish tax authorities on the grounds of the domestic anti-abuse rule. According to the prevailing tax case law, the proposed transaction could be unmade and deemed a sham for Spanish tax purposes if, for example, the followings aspects concur:

- the domestic bank is deemed not to be the real legal owner of the shares but a mere fiduciary owner of the same. This circumstance could be appreciated to the extent that the domestic bank does not benefit from the rights attached to the shares (not only economic rights but also

CONFIDENTIAL

WH_MDL_00463511

political rights), has limitations as an owner of the shares and cannot use them, or the domestic bank has pre-agreed to sell the shares to the foreign investor after the forward; and

- the domestic bank has not recorded the dividends in its taxable income for corporate tax purposes.

The re-characterisation risk should be reduced if the forward counter-party is unknown to the domestic bank because the short position is entered in a futures market.

### UK

Bank should be regarded as the beneficial owner of the shares and of the dividends paid in respect of the shares. Beneficial ownership should not be compromised by the cash settled forward.

As a trader, Bank would be subject to UK corporation tax in respect of the economic profit (or loss) from the transaction in line with its accounts drawn up in accordance with generally accepted accounting practice (GAAP).

There is a question whether the dividend related amount taken into account in the calculation of the cash settlement payment for the forward is a manufactured dividend for UK tax purposes. This will depend on the facts and circumstances of the particular transaction and the way in which the dividend related amount is dealt with as a contractual matter per the forward documentation. On the assumed facts here, it should not matter in any event if Bank were deemed to pay a manufactured dividend.

### US

The dividend equivalent payment made to a share seller under certain long equity derivatives may fare better until the proposed US Treasury regulations become effective. The statute itself imposes withholding only on payments under stock loans, repurchase agreements and SNPCs. The statute would apply to a swap between the foreign shareholder and the domestic share buyer in this case.

The swap would be an SNPC because the long party transfers the underlying shares to the short party at the outset. Until the proposed regulations come into effect, however, the statute apparently does not apply to forwards and matched options. Forwards and matched options are not notional principal contracts. A cash settlement of the forward or the exercised option therefore should not be covered even though the amount paid or delivered reflects dividends paid during the forward or option period.

If forward or option contracts are physically settled, there is a not inconsiderable risk that the share sale coupled with the long equity contract with the share buyer (or its affiliate) would be characterised as a stock loan.[28] Physical settlement means that the initial share seller is certain to receive equivalent shares from the initial share buyer when the overall transaction terminates. If the transaction is a stock loan in substance, the dividend equivalent payment would be subject to withholding under the statute as it was under prior law.

---

[28] The contract should not be characterized as a repurchase agreement if no legal or practical restraints prevent the share buyer from reselling or otherwise transferring the shares and no course of conduct indicates that the buyer implicitly agreed to return the identical shares.

CONFIDENTIAL    WH_MDL_00463512

2. Transfer of shares across the dividend record date

**Stock loan**



Before the dividend record date of Issuer, Investor as lender enters into a stock loan over the Shares with Bank as borrower. The stock loan has a tenor of at least 10 days. Bank receives the dividend payment. Bank is then required to make a manufactured dividend payment to Investor equal to [X per cent] of the gross dividend. On maturity, Bank delivers Shares of the same kind (not necessarily the identical shares) to Investor.

**Austria**

Under Austrian tax law, the Austrian bank should be considered the beneficial owner of the shares on the dividend record date and exempt with the gross dividend (unless the stock loan is entered into to grant a short-term security). The manufactured dividend paid to the foreign issuer is not deductible for corporate tax purposes.

Austrian withholding tax may apply on a manufactured dividend paid for Austrian shares as of 1 April 2012 if the manufactured dividend is paid by an Austrian credit institution or Austrian branch of a non-Austrian credit institution, however, not if paid by other corporate entities. A manufactured dividend paid for non-Austrian shares should not be subject to Austrian withholding tax.

**Belgium**

From a Belgian tax perspective, the transaction should be treated as follows:

- the full amount of the dividend coupon will be taxable at the level of the domestic bank as borrower;

- the domestic bank will be able to fully deduct the IMC paid to the foreign investor. To that effect, it is specified that taxation of the income from the underlying financial instrument will occur at the moment when the coupon is payable, and not at the end of an accounting year in proportion to the time involved. The same will be the case for the deduction of the IMC;

CONFIDENTIAL    WH_MDL_00463513

- the domestic bank will be entitled to a credit for withholding taxes suffered on the dividend, in order to enable it to use the gross dividend amount to paid the IMC; and

- Although the IMC qualifies as an indemnity, it is generally subject to Belgian withholding tax, but if the foreign investor is located in a treaty country, or has entered into the transaction on a centralised lending system, or is a non-profit organisation, a withholding tax exemption will apply.

### France

Under French tax law, the French bank should be considered the beneficial owner of the dividend payment from the French issuer on the shares to the extent that the legal title to the shares is transferred to it under the stock loan. As a consequence, the dividend would be included in the French bank's taxable income for French corporate income tax purposes.

The French bank's manufactured dividend payment to the foreign investor should not be subject to French dividend withholding tax, but it would be subject to French withholding tax on remuneration of services at the rate of 33. 1/3 per cent, subject to the applicable treaty, which would generally prohibit France from taxing such payment unless the foreign investor is acting from a French permanent establishment.

For French corporate income tax purposes, the manufactured payment to the foreign investor should be deductible from the French bank's taxable income.

Again, it cannot be excluded that the French tax authorities would consider that the sole purpose of the transaction is to avoid the dividend withholding tax that would have been payable had the dividend been paid directly to the foreign issuer and, on the basis of the domestic anti-abuse rules, consider that the beneficial owner of the dividend payment is in fact the foreign issuer so that the dividend withholding tax is applicable. To prevent a challenge on those bases, it would be essential to ensure that the French bank has a meaningful measure of economic risk in relation to the shares (this can be achieved in various ways).

### Germany

Under German tax law, the domestic bank is considered the beneficial owner of the shares on the dividend record date and is, therefore, fully taxable with the gross dividend. Correspondingly, the MOD paid to the foreign issuer is 100 per cent deductible for corporate tax purposes and at least 75 per cent deductible for trade tax purposes (arguably 100 per cent).

The domestic bank is under no withholding tax obligation when paying the MOD to the foreign investor, and the foreign investor is not taxable in Germany with the received MOD.

The transaction cannot be requalified on the grounds of the domestic anti-abuse rule.

---

CONFIDENTIAL    WH_MDL_00463514

## Italy

Under the stock loan agreement the legal title of the shares is transferred to the domestic bank. Accordingly, the domestic bank is entitled to receive any profit distribution over the shares. In particular, the Italian tax rules provide that the domestic bank is deemed the owner of the shares on the dividend record date. However, according to the prevailing view, dividend payments collected by the domestic bank in such context would be taxable for IRES purposes due to a specific tax law provision whereby, for borrowed shares the PEX Regime is available to the borrower only if it would have been available to the lender.

MODs paid by the domestic bank to the foreign investor will be subject to a withholding tax (unless the Banking Exemption or a more favourable tax treaty regime may apply) at a rate of 20 per cent.

## Netherlands

We assume that the legal title to shares is transferred to the domestic bank under the stock loan. The next question is then whether the domestic bank is also the economic owner of the shares (there is a preliminary question: whether the economic/tax ownership doctrine can apply to fungible assets such as (listed) shares and the dividends thereon?).

Under the stock loan, the full economic risk on both the shares and the dividends remains with the foreign investor on the basis of the terms and conditions of the stock loan. Hence, *prima facie* the domestic bank should not be considered the (economic) owner of the shares or the

dividends for Netherlands tax purposes. In our view, however, it is difficult to transfer 'economic ownership' of fungible assets, such as the shares or the dividends thereof, by way of entering into a similarly fungible derivative or otherwise where there is no direct link between the legal title to the shares and the instrument that transfers the economic interest. On this basis, the domestic bank is likely to be considered the economic owner of the dividends for Netherlands tax purposes.

Under the stock loan, the domestic bank clearly pays a consideration in connection with the dividends (ie, a fixed percentage of dividends as MOD). Furthermore, through the stock loan the foreign investor – if the same entity – retains a position in the shares similar to the position it had before the stock loan was entered into. Consequently, the domestic bank should not be considered the owner of dividends under the anti-dividend-stripping rules and thus not be entitled to a credit for DWT. This would only be different if the foreign investor is entitled to 100 per cent of the dividend as well (and/or in case a treaty overrides the Netherlands domestic anti-abuse rules).

The dividends and the MOD are taken into account in determining the domestic bank's taxable income for corporate income tax purposes.

## Spain

Under Spanish tax regulations, the domestic bank should be deemed the owner of the shares on dividend record date and should include the relevant dividend in its profit and loss account. The domestic bank should be entitled to the corresponding withholding

CONFIDENTIAL

**WH_MDL_00463515**

tax credit, however, as explained below, this entitlement is not free of controversy. The MOD paid to the foreign issuer should be fully deductible. The MOD should not be subject to withholding tax in Spain if the foreign issuer is entitled to an exemption on interest income (for example, a EU resident).

The transaction should not be re-characterised under Spanish general anti-avoidance rules if the stock loan is carried out under market terms, there are economic reasons to carry out this stock loan (ie, the domestic bank obtains a pre-tax profit) and the domestic bank is not a nominee of the foreign investor.

Spanish stock loan regulations establish that the borrower should be entitled to apply the dividend tax credits and exemptions resulting from its personal income taxation if, at the date of entering the stock loan, the lender met the requirements in its personal income tax taxation for the application of the same dividend tax credits or exemptions.

Therefore, when the lender is entitled to a dividend tax credit, the Spanish borrower would also have a right to such deduction. These criteria seem subjective and the lender's applicable law should be analysed on case by case, to clarify whether it would be entitled to the tax credit or exemption or not. If the lender is a Spanish taxpayer, the issue is mitigated as domestic dividends are, as general rule, subject to withholding tax and, in such case, a withholding tax credit would be applicable (this withholding tax credit is not subject to any specific conditions). If the lender is not resident in Spain, the law does not provide for any specific tax

treatment of the borrower and, therefore, one could conclude that the borrower would not be entitled to any tax credits.

However, in our view, there are sufficient arguments to conclude that the domestic bank should be entitled to benefit from the withholding tax credit. We believe the stock loan provisions should be interpreted as referred only to the underlying tax or the dividend exemption (which are subject to a number of requirements under Spanish corporate income tax law), but not the withholding tax credit, which is not subject to any specific requirements.

We believe the withholding tax is a payment on account of the taxpayer's final tax liability and must be included in the taxpayer's return. We believe the withholding tax is automatically levied irrespective of how the recipient acquired the shares or how the dividends have been accounted for.

We believe the only requirement to apply the withholding tax credit is that the dividends received have been effectively subject to withholding tax. And we believe that in the event the foreign lender is an EU resident, it could be argued that denying the withholding tax credit to the domestic bank infringes the EU principle of non-discrimination and free movement of capital.

As a result of this controversy, in practice, foreign lenders occasionally sell the shares to a Spanish counter-party that would, in turn, enter into the stock loan with the Spanish borrower.

CONFIDENTIAL                    WH_MDL_00463516

## UK

As with the forward transaction discussed above, Bank should be regarded as the beneficial owner of the shares (and the dividends paid in respect thereof) as stock borrower. As a trader, Bank would be subject to UK corporation tax in respect of the transaction in line with its profit as shown in the GAAP accounts. No UK tax should need to be withheld from the manufactured payment.

## US

The dividend equivalent payment made to the stock lender under the stock-lending agreement will be subject to US withholding tax at the same rate as the underlying dividend. Treasury regulations imposed this treatment many years ago, and the recent statute that extended withholding to a wider range of dividend equivalents requires dividend withholding on substitute payments made in stock-lending and repurchase transactions.



CONFIDENTIAL    WH_MDL_00463517

### 3. Sale of future dividend entitlement or *usufruct* rights



Before the dividend record date of Issuer, Investor sells to Bank the *usufruct* right on the Shares or a more straightforward right to a future dividend payment. The purchase price reflecting the discounted expected dividend is payable upfront.

**Austria**

The sale of the dividend entitlement does not trigger a limited tax liability in Austria for the foreign investor. Further, no withholding tax should be levied on the sale proceeds in case of a payment to a non-Austrian resident.

The payment of the genuine dividend is not a taxable event for the foreign branch but rather a profit and loss neutral collection of a receivable up to the amount paid for the dividend entitlement. In addition, the foreign branch is entitled to a refund of the withholding tax imposed upon distribution of the dividend.

In our view the sale of dividend entitlement should not be considered as abusive.

**Belgium**

As the foreign branch will not have title to the income generating asset (the shares) the Belgian tax authorities will not recognise the foreign branch as the beneficial owner for determining the application of Belgian dividend withholding tax exemptions.

From a Belgian tax law perspective, any internal law or treaty dividend withholding tax reduction or exemption would be based on Foreign Investor's identity.

The manufactured dividend payable by the foreign branch to the foreign investor would for Belgian tax law purposes not be considered to constitute a dividend payment from the domestic issuer. Hence, it would not be subject to Belgian dividend withholding tax nor to any other Belgian taxes.

CONFIDENTIAL                                                                              WH_MDL_00463518

**France**

*Stripping of shares*

Under French civil law, an *usufruct (usufruit)* arrangement over shares in a French company creates a situation where the *usufruitier* steps into the shoes of the original shareholder (legal owner) in relation to the income arising on such shares. In particular, the *usufruitier* has a right to receive ordinary dividends on the shares that are the subject matter of the *usufruit*. The *usufruitier's* right is a right *in rem* (*droit réel*); ie, it is a right of the *usufruitier* enforceable against the company (as opposed to a simple claim against the legal owner), which means that the company's obligation to pay ordinary dividends arising on the shares subject to the *usufruit* is vis-à-vis the *usufruitier* (and is not different from the company's obligation to pay dividends to shareholders whose shares are not stripped).

The French tax rules should follow the (civil) law analysis:

- the sale of the usufruct right should trigger no tax liability in France for the foreign investor;

- the proceeds of the sale of the usufruct of the shares should not be treated as a dividend subject to withholding tax in France; and

- no French dividend withholding tax should be due on the dividends the French issuer pays to foreign branch in its capacity as *usufruitier* on the basis either that the French dividend withholding tax should not apply to dividends paid to the foreign branch of

a French tax resident company (which is debatable), or in any case, if the foreign branch is established in a country that has a double tax treaty with France in line with the OECD model, on the basis of the articles of such treaty corresponding to articles 21.2 and 7 of the OECD model.

*Straightforward sale of a future dividend entitlement*

The sale of the dividend entitlement would not trigger a tax liability in France for the foreign investor as the sale proceed should not be considered as a dividend payment from the French issuer.

Contrary to the *usufruct* situation, (and assuming Bank allocates the entitlement to a foreign branch (Foreign Branch) Foreign Branch's right under the future sale would not be enforceable against the French issuer, but only against the foreign investor. Hence, from a legal point of view, as the legal owner of the shares, the dividend entitlement would remain in the foreign investor. As a consequence, the French issuer's paying agent would effect the withholding (at the rate appropriate to the foreign investor's situation: 30 per cent or 15 per cent (generally if the foreign investor is eligible for treaty relief and notably if the foreign investor can be considered as the beneficial owner of the dividend payment – see below) on the dividend payment to the foreign investor.

Whether, under the 'economic exposure' test mentioned above, the foreign investor should be considered the beneficial owner of the dividend payment received from the French issuer on the shares and, consequently, whether the foreign

Freshfields Bruckhaus Deringer LLP          *Dividend taxation for cross-border transactions*

CONFIDENTIAL                    WH_MDL_00463519

investor would be eligible to the reduced dividend withholding tax rate under the tax treaty between France and its state of residency, would mainly depend on the characteristics of the transaction.

On the foreign investor's subsequent payment of the 'manufactured dividend' to Foreign Branch, which should equal the net dividend received, no tax liability should arise for the foreign investor or Foreign Branch in France as they are not French tax residents and such 'manufactured dividend' should not be considered as a dividend payment from the French issuer.

The question remains whether, if Foreign Branch is considered the beneficial owner of the dividend payment instead of the foreign investor, Foreign Branch would be entitled to a refund of the withholding tax imposed on the distribution of the dividend to the foreign investor on the basis that, if the dividend had been paid directly to Foreign Branch, no withholding tax would have applied (see 'Stripping of shares', above).

### Germany

The sale of the dividend entitlement does not trigger a limited tax liability in Germany for the foreign investor, albeit the sales proceeds are re-qualified under domestic tax laws into a dividend. Further, no withholding tax is imposed on the sales proceeds.

On subsequent payment of the dividend to the foreign branch, no tax liability arises for the foreign investor. The taxation was conclusively accelerated on sale of the dividend entitlement. Consequently, the payment of the genuine dividend is not taxable.

For the same reason, payment of the genuine dividend is not taxable for the foreign branch but rather a profit and loss neutral collection of a receivable. In addition, the foreign branch is entitled to a refund of the withholding tax imposed on distribution of the dividend where applicable.

In our view, the sale of dividend entitlement cannot be considered abusive. This has also been confirmed by a Federal Fiscal Court decision.

### Italy

The present case could be only realised through the transfer of an *in rem right* over the shares, such as the *usufruct* right. Indeed, the foreign investor could sell to the foreign branch the entitlement to receive the dividends transferring, for instance, the only *usufructuary* right over the shares ('*diritto di usufrutto*'); ie, the legal right to use and derive profits or benefits from the shares that still belong to the foreign investor ('*nudo proprietario*').

According to the Italian tax authorities, transfer of the usufruct right is to be treated as a capital gain for Italian tax purposes. As a consequence, the items of income paid on the *usufruct* agreement on the shares should qualify from an Italian income tax perspective as capital gain, as such subject to a 20 per cent substitute tax. That is, unless the foreign investor is a white-list investor on the basis of a specific Italian exemption or may benefit from a double tax treaty protection.

It should be considered that, even though the above structure (transfer of an *in rem* right) is formally correct, in the Italian

CONFIDENTIAL    WH_MDL_00463520

tax practice, the case at stake could represent a dividend-stripping scheme that in the previous years has been often considered as abusive and consequently disregarded for tax purposes.

### Netherlands

For Netherlands tax purposes, the decisive moment is the record date. Given that the dividend entitlement is disposed of before the record date, the foreign investor will not receive the actual dividend, but a consideration under the sale of such dividend. The actual dividend will be received by (the credit institution through) the foreign branch.

Given that the dividends are disposed of to the foreign branch, the foreign branch should be considered the economic owner of the dividends for Netherlands tax purposes.

If the participation exemption applies on the credit institution's shareholding, the domestic issuer would have still have to withhold DWT (ie, the distribution would not be exempt from DWT) if the shares are allocable to the foreign branch.

In that case, the credit institution may be entitled to a refund of DWT (notwithstanding that the participation exemption applies at the level of the credit institution), unless the credit institution is not considered the beneficial owner of the dividend under the anti-dividend-stripping rules. Whereas the credit

institution (through the foreign branch) clearly pays a consideration in connection with the dividends (ie, the consideration under the dividend sale) and the foreign investor retains a position in the shares similar to the position it had before the dividend sale, the foreign branch (through the credit institution) should not be considered the beneficial owner of the dividends under the anti-dividend-stripping rules. Consequently, the foreign branch (through the credit institution) should not be entitled to a credit for DWT.

As the foreign investor is not tax resident in the Netherlands, there are no Netherlands tax consequences whatsoever for the foreign investor.

If the shares are not allocable to the foreign branch, but to credit institution's headquarters, the dividend should be subject to corporate income tax in the hands of the credit institution in case the participation exemption is not applicable to its shareholding. If credit institution's shareholding qualifies for the participation exemption, the dividend should be exempt from corporate income tax in the hands of credit institution.

If the shares are allocable to the foreign branch, the dividend income should, in principle, be subject to Netherlands corporate income tax in the hands of the credit institution, subject to relief in the Netherlands for double taxation.

CONFIDENTIAL    WH_MDL_00463521

## Spain

From a Spanish perspective, in principle, for the income to be received by the foreign branch to be characterised as a dividend (and thus entitled to a withholding and dividend tax credit), the foreign branch should have an *in rem right* over the dividend (for example, an *usufruct*). If the entitlement of the foreign branch were formalised through an agreement with no *in rem right* attached, it is likely the tax authorities would consider the foreign branch has received a manufactured dividend, which would be fully taxable and would not be entitled to any dividend or withholding tax credit.

Should the foreign branch receive the dividend under an *usufruct*, it is uncontroversial that the foreign branch should be entitled to a 50 per cent tax dividend tax credit on the gross amount of the dividends. The application of a full tax credit requires the recipient of the dividend to participate in, at least, 5 per cent of the distributing entity. In this regard, under corporate law, the beneficiary of an *usufruct* is not a shareholder of the distributing entity and, therefore, it would seem that this participation requirement would not be fulfilled.

However, the Spanish tax authorities have accepted in the past (ie, ruling dated 20 March 2001) that the beneficiary of the *usufruct* applies the full tax credit, to the extent it enjoys an *usufruct* over, at least, 5 per cent of the shares of the distributing entity, on the basis that it is the 'economic shareholder' of the entity and that the double taxation generated by the distribution of the dividend should be avoided.



CONFIDENTIAL

WH_MDL_00463522

In any case, if the foreign bank has suffered a withholding tax on the dividend distributed, it should be entitled to apply a withholding tax credit.

You should note that these types of transactions are not usual in the Spanish market because they are difficult to execute in the stock market, and they need to be instrumented through a bilateral agreement. To avoid the characterisation of transactions as repo transactions, Spanish market players avoid carrying out over-the-counter transactions and tend to enter into transactions with the market.

### UK

Is it possible as a matter of UK law to separate the beneficial owner of dividend rights from the other rights associated with share ownership. As with the other examples, Bank would expect to be subject to UK corporation tax in line with its accounting profits. The price paid to acquire the dividend rights should not be regarded as a manufactured dividend: the definition of manufactured payment requires an associated agreement for the transfer of shares.

### US

This case raises two questions. First, is the coupon sale a true sale that transfers beneficial ownership of the dividend. That depends on whether the buyer takes the risk that the dividend will not be paid. The transfer generally will not be a true sale if the dividend already has been declared. The transfer also will not be a true sale if

the buyer has recourse to the seller when no dividend is paid or the dividend paid is smaller than expected. If the transfer is not a true sale, the foreign shareholder remains the recipient of the dividend for tax purposes. The dividend equivalent amount paid to the buyer is not the dividend.

If there is no true sale of the dividend, the tax treatment of the dividend equivalent amount depends on the circumstances. When the US buyer simply buys the dividend coupon for cash, the purchase price typically would be treated as a loan from the buyer to the seller. The dividend amount the buyer receives therefore would be treated as repayment of principal and interest on the imputed loan.

When the US buyer buys the dividend on a forward purchase of the shares, however, a purchase price adjustment for the actual dividend amount could be treated as a dividend equivalent under the recently proposed US Treasury regulations. Those regulations would extend the dividend equivalent withholding regime to payments under futures, forwards and options, and a payment based on an actual dividend would be a dividend equivalent subject to withholding tax.

Second, should the purchase price paid to the foreign shareholder in a true sale of the dividend be treated as a dividend equivalent? It should not. If the transaction is a true sale, the purchase price is not subject to adjustment for the amount of the actual dividend. It is simply based on an estimate of the expected dividend.

Freshfields Bruckhaus Deringer LLP    *Dividend taxation for cross-border transactions*

CONFIDENTIAL    **WH_MDL_00463523**

A payment based on an estimate is not a dividend equivalent. Thus, even if the dividend coupon were sold in connection with a forward contract or some other SNPC, the dividend component of the purchase price would not be subject to withholding tax. The recently proposed US Treasury regulations accept that view.

CONFIDENTIAL

**WH_MDL_00463524**

# Your contacts

**Austria**
Michael Sedlaczek
T +43 1 515 15 115
E michael.sedlaczek@freshfields.com

**Belgium**
Axel Haelterman
T +32 2 504 7260
E axel.haelterman@freshfields.com

**France**
Cyril Valentin
T +33 1 44 56 33 62
E cyril.valentin@freshfields.com

**Germany**
Ulf Johannemann
T +49 69 27 30 84 19
E ulf.johannemann@freshfields.com

**Italy**
Vittorio Salvadori di Wiesenhoff
T +39 02 625 30454
E vittorio.salvadori@freshfields.com

**Netherlands**
Eelco van der Stok
T +31 20 485 7635
E eelco.vanderstok@freshfields.com

**Spain**
Silvia Paternain
T +34 91 700 3746
E silvia.paternain@freshfields.com

**UK**
David Haworth
T +44 20 7832 7755
E david.haworth@freshfields.com

**US**
Gregory May
T +1 202 777 4503
E gregory.may@freshfields.com

CONFIDENTIAL

WH_MDL_00463525

CONFIDENTIAL

WH_MDL_00463526

freshfields.com

Freshfields Bruckhaus Deringer LLP is a limited liability partnership registered in England and Wales with registered number OC334789. It is authorised and regulated by the Solicitors Regulation Authority. For regulatory information please refer to www.freshfields.com/support/legal notice. Any reference to a partner means a member, or a consultant or employee with equivalent standing and qualifications, of Freshfields Bruckhaus Deringer LLP or any of its affiliated firms or entities. This material is for general information only and is not intended to provide legal advice.

© Freshfields Bruckhaus Deringer LLP 2012, March 2012, 32078

CONFIDENTIAL

WH_MDL_00463527